**GREENSTEIN TRUCKING COMPANY,**
a corporation

v.

**UNITED STATES of America et al.**

**Civ. A. No. 16028.**

United States District Court,
N. D. Georgia,
Atlanta Division.

June 5, 1972.

Martin Sack, Jr., Jacksonville, Fla., for plaintiff.

Postell & Hall, Atlanta, Ga., for Harper.

Richard Kenney, Miami, Fla., and Watkins & Daniell, Atlanta, Ga., for Alterman.

Walker B. Comegys, Acting Asst. Atty. Gen. and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and John W. Stokes, U. S. Atty., Atlanta, Ga., for the United States.

Fritz R. Kahn, General Counsel and Geraldine R. Keyes, Atty., Interstate Commerce Commission, Washington, D. C., for ICC.

Before BELL, Circuit Judge, EDENFIELD and O'KELLEY, District Judges.

EDENFIELD, District Judge:

Plaintiff Greenstein Trucking Company seeks to enjoin the operation of a final order of the Interstate Commerce Commission. Both the parties and the ICC certificate involved in this litigation have previously been before this court. Refrigerated Transport Co. v. United States, 297 F.Supp 5 (N.D.Ga.1969).

*Case History*

On June 10, 1963, Greenstein filed an application with the Interstate Commerce Commission for a certificate of public convenience and necessity authorizing it to transport certain meats, refrigerated foods, and dairy products from St. Paul, Minnesota; Chicago, Illinois; and points in Wisconsin; to points in Florida, Georgia, Tennessee, South Carolina and Alabama. The application as filed by Greenstein proposed that three restrictions be annexed to the certificate, namely: (1) that shipments originating in St. Paul be limited to those which were subsequently to stop at one or more points in Wisconsin to com-

plete loading; (2) that shipments from Chicago be limited to those which had originated at one or more points in Wisconsin and which stopped in Chicago only to complete loading; (3) that deliveries in Alabama, Tennessee, and South Carolina be limited to shipments which were to be partially unloaded there, with the remainder of the shipment having a final destination in Florida and/or Georgia. (These restrictions originally sought by Greenstein are hereinafter referred to as the "multiple pickup and delivery" restrictions.)

After numerous protests had been filed against the application, a hearing was held on December 19, 1963 before an Examiner for the Commission. On July 24, 1964, the Examiner recommended that the application be denied for reasons no longer relevant here. Greenstein excepted and obtained review. On December 28, 1964, Operating Rights Review Board No. 3 adopted the Examiner's statement of facts but reversed his recommendation and granted the application. In granting the application, however, the Review Board deleted the three "multiple pickup and delivery" restrictions contained in Greenstein's original application and substituted in lieu thereof a "mixed load" restriction, which authorized only shipments consisting of mixed loads of meat and dairy products. The "mixed load" restriction was substituted without further notice or a hearing being afforded other carriers.

Several competing carriers (hereinafter "protestants"), claiming to be adversely affected by the "mixed load" restriction, petitioned for reconsideration. The Commission denied reconsideration and on October 12, 1965, issued Greenstein a certificate of public convenience and necessity containing the substituted "mixed load" restriction.

In August, 1967, protestants petitioned the Commission to reopen the matter, contending that the "mixed load" restriction was ambiguous, that Greenstein was operating in violation of the restriction, and that the authority

granted was broader than that applied for and noticed in the Federal Register. Protestants requested that on further hearing the ICC modify Greenstein's certificate to grant no greater authority than that sought by Greenstein's original application. In November, 1967, the Commission denied reopening and protestants subsequently sought relief in this court.

In connection with its first encounter with this controversy, three aspects of the case gave the court concern. First, were protestants denied procedural due process when they were denied a hearing as to the effects and consequences of substituting the "mixed load" restriction for the "multiple pickup and delivery" restriction originally sought by Greenstein. Secondly, there was concern over the ambiguity of the "mixed load" restriction. Thirdly, the court questioned whether the Commission should not have made some effort to ascertain whether Greenstein was in fact operating within the authority granted. The court concluded that protestants should have been given an opportunity to be heard on the consequences of the substituted "mixed load" restriction and remanded the case to the Commission for the purpose of providing such a hearing.

On remand, the Commission republished in the Federal Register the authority granted to Greenstein and further hearings were conducted. On June 24, 1971, the Commission rendered its decision which eliminated the "mixed load" restriction from Greenstein's certificate and modified the certificate so that it was restricted to the transportation of traffic originating at the plant-sites, or storage facilities, of Armour & Company at Chicago, Illinois; St. Paul, Minnesota, and points in Wisconsin and destined to points in Alabama, Georgia, Florida, South Carolina, and Tennessee (hereinafter the "single plantsite" restriction). Greenstein's petition for reconsideration was denied by the Commission on October 5, 1971, and the petition for determination of an issue of

general transportation importance was denied on November 12, 1971.

In December 1971 Greenstein instituted this action in the Southern District of Florida seeking to enjoin the operation of the Commission's order. The court denied Greenstein's motion for a temporary restraining order and ordered that the case be transferred to the Northern District of Georgia.

In challenging the Commission's action, plaintiff's contentions are twofold. First, plaintiff contends that the action taken by the Commission in imposing the "single plantsite" restriction is contrary to the 1969 mandate of this court. Secondly, plaintiff argues that the Commission's order is unsupported by both the evidence and the Commission's own findings and is therefore arbitrary. Plaintiff requests that the court set aside the Commission's action which imposed the "single plantsite" restriction and that the case be remanded to the Commission with directions to enter an order consistent with one of the three alternatives: (a) reinstating the "mixed load" certificate issued on October 12, 1965; or (b) issuing a revised certificate restricting the authority granted in the "mixed load" certificate so as to bar interlining;[1] or (c) issuing a revised certificate containing the "multiple pickup and delivery" restrictions originally applied for by plaintiff.

### Scope of 1969 Remand

The language used by the court in remanding the case in 1969 is as follows:

".  .  . [T]he Commission should order a republication in the Federal Register of the ICC order and certificate as granted, with an opportunity being given the plaintiffs [protestants] to offer evidence and to be heard. The Commission will then re-examine the evidence and the arguments and determine whether or not its action and order should stand or be set aside."

Under strict analysis the Commission had two alternatives under the order remanding the case. The Commission could allow the certificate to stand as issued with the "mixed load" restriction, or it could set aside the certificate as issued. The mandate is mute as to what action, if any, the Commission could or should take if it determined that the certificate as issued should be set aside.

On remand, the Commission determined that its action in issuing the certificate with the "mixed load" restriction had been inappropriate. Therefore, the effect of the Commission's action was to set aside the certificate as previously issued.[2] Under the mandate of this court the Commission need not have gone any further. Nevertheless, the Commission determined that a certificate should be issued but that it should be modified to include a "single plantsite" rather than a "mixed load" restriction. This action by the Commission constitutes a determination as to which the 1969 mandate is mute.

It does not necessarily follow, however, that the Commission in modifying the certificate acted without having authority to do so. Since the mandate neither prescribes nor proscribes the action taken, the question becomes whether, notwithstanding the 1969 mandate, the Commission had the authority and power to modify the certificate as it did on rehearing. We have concluded

---

1. By including this alternative, plaintiff in effect concedes that the Commission had authority under the law and the 1969 mandate of this court to impose a new restriction on remand. The fact that plaintiff would have preferred a bar against interlining rather than the "single plantsite" restriction goes to the merits of the Commission's action rather than to its authority to act.

2. The Commission adopted the Examiner's report which was phrased in terms of allowing the certificate to stand but modifying and reissuing it to include the "single plantsite" restriction. Notwithstanding the semantics involved, the effect of the Commission's action was to cancel the "mixed load" certificate and reissue a certificate with the "single plantsite" restriction.

that the Commission does have such authority.

In Carl Subler Trucking, Inc. v. United States, 313 F.Supp. 971 (S.D.Ohio 1970), the carrier applying for a certificate amended his application to change the point of origin. A certificate was subsequently issued granting the authority sought in the carrier's amended application. Contrary to expectations, the certificate had the effect of conferring broader authority than that originally sought, since under the certificate as issued the carrier could provide an expanded service by tacking at the point of origin the authority granted to it by various certificates.[3] Competing carriers, who were adversely affected by the expanded service and who had received no notice of the amended application, sought to prohibit the tacking operations. The Commission, after review, cancelled the certificate as issued and issued a corrected certificate restricting the scope of the point of origin, thereby effectively eliminating the tacking operations. The then-aggrieved applicant sought judicial review contending that the Commission had no authority to modify the certificate. In rejecting the contention, a three-judge court ruled that the Commission "had inherent power to modify a certificate where an amendment broadening the scope of an application was incorporated into the certificate without notice to competing carriers." 313 F.Supp. at 976.

In May Trucking Co. v. United States, 290 F.Supp. 38 (D.Idaho 1968), a three-judge court was confronted with another situation in which the Commission had issued a certificate granting greater authority than that applied for and noticed in the Federal Register. In upholding the action taken by the Commission the court held that the "Commission has the power to correct its manifest error by canceling the outstanding certificate issued . . . and reissuing a modified certificate granting the operating rights originally applied for. . . ." 290 F. Supp. at 39.

It is undisputed that the authority originally granted by the Commission in the instant case was greater than the authority applied for by Greenstein[4] and it has been determined that this action was taken by the Commission without having afforded competing carriers proper notice and opportunity to be heard. Refrigerated Transport, Inc. v. United States, supra. Under these circumstances and upon a finding that the certificate as issued adversely affects competing carriers, the Commission does have the authority on rehearing to modify the existing certificate as noted by the courts in Carl Subler Trucking Co. v. United States, supra, and May Trucking Co. v. United States, supra. Certainly nothing ordered by the 1969 mandate of this court precludes such a modification. In fact, it was the intention of this court to allow the Commission to

3. The origin point sought in the original application was Davies and Hancock Counties, Kentucky. By the amendment the origin point was changed to Owensboro, Kentucky, which under ICC practices designated the Owensboro Commercial Zone which included points in Indiana. As a result of the amendment the applicant could tack his existing authority (from Florida to points in Indiana within the Owensboro Commercial Zone) onto his newly acquired authority (from Owensboro to points in twelve states) and thereby substantially expand his service to the detriment of competing carriers.

4. By plaintiff's admissions on oral argument, under a certificate containing the

"multiple pickup and delivery" restrictions originally sought, Greenstein could have interlined only through points in Wisconsin. Under the "mixed load" authority granted without notice to competing carriers Greenstein was able to interline through St. Paul and, more importantly, Chicago, in addition to points in Wisconsin. By utilizing interlining operations, particularly in Chicago, Greenstein was able to extend services to various points in the mid-west well beyond the origin points designated in its certificate. It also appears that under the "mixed load" certificate Greenstein could transport straight shipments of goods from the point of origin without being subject to the "multiple pickup and delivery" restrictions originally proposed.

reexamine the "mixed load" certificate issued to Greenstein in light of all the circumstances, particularly those developed on rehearing, and to take whatever action it deemed apporpriate.[5] This the Commission has done. Had it not modified the certificate after determining that its prior action was inappropriate, Greenstein, for all that appears, would have wound up with no certificate at all. Therefore, it appears that the motivating factor behind Greenstein's action stems from a dissatisfaction with the "single plantsite" restriction imposed by the Commission.[6]

### "Single Plantsite" Restriction

Prior to our consideration of the propriety of the Commission's action, it becomes appropriate to once again set forth the well-established standards applicable to judicial review of an order of the Commission. In Illinois Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966), the Supreme Court stated:

"The test on judicial review is, of course, whether the action of the Commission is supported by 'substantial evidence' on the record viewed as a whole, 5 U.S.C. § 1009(e) (5). Substantial evidence is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'" 385 U.S. at 66, 87 S.Ct. at 260, citing National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

In discussing the function of a reviewing court the Supreme Court in United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946), commented:

"It is not true, . . . that 'the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law." 327 U.S. at 535–536, 66 S. Ct. at 698.

The federal district courts have consistently applied these standards in reviewing orders of the Commission. *E. g.*, Towne Services Household Goods Transportation Co. v. United States, 329 F. Supp. 815 (W.D.Tex.1971); Mitchell Bros. Truck Lines v. United States, 327 F.Supp. 796 (D.Ore.1971); Superior Trucking Co. v. United States, 306 F. Supp. 872 (N.D.Ga.1969); Iowa Beef Packers, Inc. v. United States, 297 F. Supp. 1156 (N.D.Iowa 1969); Atlantic Coast Line R. R. v. United States, 205 F.Supp. 360 (M.D.Ga.1962); Atlanta-New Orleans Motor Freight Co. v. United States, 197 F.Supp. 364 (N.D.Ga. 1961).

---

5. Since the effect of the 1969 remand was to reopen the proceedings for further consideration, it follows that if the Commission had authority to impose the "mixed load" restriction on the initial consideration, it also had the authority to impose the "single plantsite" restriction on reconsideration.

6. Plaintiff does not contend that it was denied procedural due process with respect to the proceedings before the Commission on remand.

The Commission found that taking the record as a whole it reveals

". . . that although protestants have been to some extent adversely affected by applicant's operations which originated traffic at the considered origins, by far the greater adverse effect on them has been, and will continue to be, from applicant's interline operations to the Southeast for traffic from points beyond those origins." (113 M.C.C. 492.)

Based upon this conclusion, the Commission determined that a more meaningful restriction than the "mixed load" restriction was required to protect competing carriers. In support of its finding the Commission admitted that:

"While there is no conclusive evidence of record that applicant's operations have had a direct adverse effect on these [protestant's] operations, we are persuaded that they have had some adverse impact and that at the very least they constitute a serious threat to protestant's future operations." 113 M.C.C. at 495.

We need only find substantial, not conclusive, evidence to uphold the Commission's action. *E. g.,* Illinois Central R. R. v. Norfolk & Western Ry., *supra.* Based upon our review of the record, we find that the Commission's crucial finding is supported by such evidence.

Subsequent to the grant of authority containing the "mixed load" restriction, Greenstein increased its activity in the Chicago area, particularly with respect to shipments of meat originating at points beyond the Chicago area and obtained by Greenstein through various interline operations with other carriers. (*E. g.,* Tr. 159–164; Ex. 19, 21, 22, 23.) As a result of this expanded service, shipping traffic previously handled by competing carriers was subject to possible diversion by Greenstein. There are also indications in the record that some traffic previously handled by protestants was in fact now being handled by Greenstein pursuant to its "mixed load" authority. (*E. g.,* Tr. 285–301.) In the exercise of its discretion the Commission determined that the competing carriers should be protected from such actual and possible diversion. By striking the "mixed load" restriction from Greenstein's certificate and substituting the "single plantsite" restriction, the Commission has unquestionably achieved this objective.

The removal of the "mixed load" restriction does not represent arbitrary action on the part of the Commission. Under the Commission's view the "mixed load" restriction was substituted to implement a transportation service similar to that which would have resulted had the "multiple pickup and delivery" restrictions originally proposed been accepted. When it appeared upon reviewing the evidence that Greenstein was not making multiple pickups (Tr. 182–198), the Commission reasoned that there was consequently no need for the mixed load restriction. While this reasoning appears sufficient in and of itself, it should perhaps be further noted that the record suggests Greenstein was not operating in compliance with the "mixed load" requirement. In one instance, for example, Greenstein transported 35,817 pounds of meat from Sioux City, Iowa, to Miami, Florida, by interline through Chicago. The attempt to comply with the "mixed load" requirement consisted of placing 121 pounds of dairy products in an ice bunker in the front of the truck. (Tr. 173–174.) It is therefore apparent that not only did the "mixed load" restriction provide greater operating authority than the Commission intended but Greenstein's mode of operation under the restriction further served to expand Greenstein's operations beyond the scope envisioned. Under these circumstances, the elimination of the "mixed load" restriction was anything but arbitrary.

We further find that in imposing the "single plantsite" restriction the Commission did not abuse its discretion. Armour & Company was the sole supporting shipper for Greenstein's original application. At the initial hearing in

1963 Armour's representative testified that the service proposed by Greenstein would provide the shipping services needed by Armour. (Tr. 20–26.) The evidence on rehearing suggests, however, that Armour has not utilized these services. (E. g., Tr. 167–168.) Nevertheless, the Commission determined that Greenstein should be granted authority to transport goods for Armour from the considered origins. While the operating authority granted under the "single plantsite" restriction is far more restricted than under the mixed load restriction, we cannot say that the restriction is unwarranted in law or fact, particularly in light of the adverse effect on competing carriers of Greenstein's previous operations and the inability to effectively police Greenstein's operations under the "mixed load" restriction.

Greenstein complains that after years of operation under the "mixed load" certificate, the imposition of the "single plantsite" restriction is inequitable, in that it eliminates the opportunity to serve shippers other than Armour and will cause an extreme financial hardship on Greenstein's operations. Undoubtedly the new restriction will adversely affect Greenstein's operations, since under the "mixed load" certificate, operations were expanded to apparently require additional investments in equipment and personnel. Nevertheless, interstate transportation authority is not granted by the Commission pursuant to the doctrine of estoppel. Such grants are based on a determination of the public need. Furthermore, Greenstein's expanded operations to some extent appear to be the result of Greenstein's own questionable compliance with the "mixed load" restriction. The record shows that the authority granted to Greenstein on rehearing is consistent with the evidence presented in support of the original application. While it is unfortunate that controversy surrounding Greenstein's application has continued for so long, we conclude that the result reached by the Commission is both authorized by law and warranted by the record.

Accordingly, the injunctive relief sought by plaintiff must be and is hereby denied.